**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) | |
| K.C. & K.G., (minor children), | ) ) | |
| and, | ) ) | |
| R.C., (mother) & T.G. (father), | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 04A05-1401-JT-47 |
| INDIANA DEPARTMENT OF CHLD SERVICES. | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE BENTON CIRCUIT COURT

**September 19, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

R.C. ("Mother") appeals the termination of her parental rights to her children, K.C. and K.G. T.G. ("Father"), who is the biological father of K.G. only, appeals the termination of his parental rights to that child. We affirm.

## Issue

The issue before us is whether there is sufficient evidence to support the termination of Mother's and Father's parental rights.

## Facts

Mother is the biological mother of K.C., born in 2007, and K.G., born in 2009. Father is the biological father of K.G. but not K.C., although K.C. called Father "dad." K.C.'s biological father is unknown. Mother and Father lived together for some time. They had a volatile relationship fueled by alcohol use and frequent incidents of domestic violence in which the police often had to intervene. K.C. developed post-traumatic stress disorder ("PTSD") as a result of witnessing the domestic violence between Mother and Father. K.G. has not been diagnosed with PTSD.

In April 2012, Father and Mother were arrested after Father was driving while intoxicated with the children unrestrained in the vehicle. The Department of Child Services

("DCS") became involved, and the children were subsequently declared to be children in need of services ("CHINS"). The children were not immediately removed from the home. In June 2012, however, the children were removed from the home and placed in foster care because Mother and Father continued drinking and fighting in front of the children. There is no evidence that the children were physically abused or malnourished or that the home they were living in was inadequate. Father was steadily employed, while Mother stayed at home. DCS's plan for both parents was to initially and primarily address their alcohol abuse ahead of other concerns.

Father eventually was convicted of operating while intoxicated for the April 2012 incident, with a sentencing enhancement for being an habitual substance offender. His total sentence was six years, with two suspended and four executed. He began his period of incarceration in February 2013, with an expected release date in February 2015. Before entering prison, Father continued to drink, even after undergoing individual counseling and attending a rehab facility in Michigan. After entering prison, Father became involved in an intensive substance abuse program that ran daily from 5:30 a.m. to 3:30 p.m. Father also participated in available parenting-related and anger management programs in the prison. Father anticipated that he would complete the substance abuse program in January 2014, which would result in his release date being moved up to August 2014. Father also would be eligible for work release upon leaving prison and his previous employer indicated its willingness to hire him back. Father planned to live with his father upon his release.

Mother was convicted of neglect of a dependent in connection with the April 2012 incident and was placed on probation. On at least four separate occasions, she was referred

3

for treatment of her alcohol abuse through an intensive outpatient program ("IOP"), but she failed to complete the program every time. Mother was twice found to have violated her probation for continuing to drink, once in January 2013 and once in April 2013. The first violation resulted in a forty-five-day sentence and the second resulted in a ninety-day sentence. After Father went to prison, he and Mother separated. Mother began dating someone else, an individual with a recent conviction for possession of paraphernalia.

In June 2013, DCS filed its petition to terminate Mother and Father's parental rights. After the petition was filed, grandparent visitation was commenced with Father's father and Mother's mother. These visits went well. There also is no evidence that visitation with Mother and Father—before he was incarcerated—raised any concerns. However, Mother's visitation would sometimes be inconsistent because of her lack of reliable transportation. When Mother would miss scheduled visitation, K.C. in particular would become upset.

In July 2013, shortly after being released from jail for her second probation violation, Mother became pregnant. There is no evidence that Mother drank at any time after she served her second probation violation sentence. All of her tests for alcohol use between August and December 2013 were negative. Mother also struggled with housing and employment after Father was incarcerated. She lived in approximately six different residences during 2013, and she had one job lasting less than thirty days and one lasting less than two weeks. In December 2013, Mother was living with her current boyfriend's aunt. Mother also has a warrant for her arrest outstanding in Illinois for an unspecified misdemeanor.

4

The trial court conducted a termination hearing on December 6, 2013. At that time, Mother was facing a third revocation of her probation because of her failure to complete an IOP. In fact, Mother had missed an initial IOP appointment for her fourth referral just four days before the termination hearing. Also, at the time of the termination hearing, Father had not yet completed his prison substance abuse program. The foster mother with whom K.C. and K.G. had been living since July 2012 expressed her and her husband's interest in adopting both children. Evidence also was presented of the close relationship between K.C. and K.G. and that, generally, the behavior and mental health of both children had improved since being in foster care. However, in the months immediately preceding the termination hearing, K.G. had developed some behavioral issues such as hitting and impulsiveness.

On January 16, 2014, the trial court terminated both Mother and Father's parental rights. After the termination was granted, Father filed a motion for relief from judgment with the trial court, submitting evidence that he had completed his substance abuse program and now had an expected release date of August 2014. The trial court denied this motion. Both Mother and Father now appeal.

**Analysis**

"When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and reasonable inferences most favorable to the judgment. Id. "We must also give 'due regard' to the trial court's unique opportunity to judge the credibility of the witnesses." Id. (quoting Indiana Trial Rule 52(A)). Where a trial court enters findings of

5

fact and conclusions thereon, as the trial court did here, we apply a two-tiered standard of review. Id. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." Id. We will set aside the trial court's judgment only if it is clearly erroneous, which occurs if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. Id.

A petition to terminate a parent-child relationship must allege:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS has the burden of proving these allegations by clear and convincing evidence. I.A., 934 N.E.2d at 1133. We also keep in mind "that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." McBride v. Monroe County Office of Family & Children, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

Our supreme court recently observed:

> Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts, recognizing their superior vantage point for weighing the evidence and assessing witness credibility. Because a case that seems close on a "dry record" may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence.

In re E.M., 4 N.E.3d 636, 640 (Ind. 2014). Although termination of parental rights requires clear and convincing evidence, this standard "is not a license to reweigh the evidence." Id. at 642. We do not independently determine whether that heightened standard is met but must defer to the trial court's findings. Id. Even if the evidence could have permitted a

denial of termination, we will not reverse a granting of termination unless the evidence compels denial. Id. at 649.[1]

Mother and Father argue that there was insufficient evidence either that the conditions resulting in the children's removal would not remedied or that continuation of the parent-child relationship poses a threat to the well-being of the children. The trial court found sufficient evidence to support a conclusion as to both. Because the termination statute is written in the disjunctive, the DCS was only required to prove one or the other, but not both.[2] See Bester v. Lake County Office of Family & Children, 839 N.E.2d 143, 148 n.5 (Ind. 2005). We will focus our analysis upon whether there is sufficient evidence that continuation of the parent-child relationship poses a threat to the well-being of the children and need not determine whether there was a reasonable probability that the conditions leading to the children's removal from Mother and Father's home would not be remedied. See id.

"In determining whether the continuation of a parent-child relationship poses a threat to the children, a trial court should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." In re A.P., 981 N.E.2d 75, 81 (Ind. Ct. App. 2012). Courts must also judge a parent's fitness to care for her child as of the time of the termination hearing, taking into

---

[1] On appeal, Mother and Father urge us to apply a less deferential standard of review, in accordance with Justice Rucker's dissent in E.M. We are required, however, to follow the majority opinion in E.M. and its emphasis upon great deference to trial courts in termination cases.

[2] There is no evidence that either child had twice previously been found to be CHINS, as allowed for a third grounds for termination under Indiana Code Section 31-35-2-4(b)(2)(B)(iii).

8

consideration any evidence of changed conditions. Id. Courts also may consider any services offered by the DCS and a parent's response to those services. In re J.C., 994 N.E.2d 278, 287 (Ind. Ct. App. 2013). "Additionally, in evaluating a parent's habitual pattern of conduct, courts have properly considered, among other things, evidence of a parent's prior drug and alcohol abuse, history of neglect, and failure to provide financial support." A.J. v. Marion County Office of Family & Children, 881 N.E.2d 706, 717 (Ind. Ct. App. 2008), trans. denied.

Here, Mother and Father threatened the well-being of K.C. and K.G. by their excessive drinking, which led to violent confrontations in front of the children. These confrontations left at least K.C. with PTSD. Although there is no evidence the children were physically abused, this emotional trauma can in fact be categorized as abuse of both children, even if K.G. has not been diagnosed with PTSD. See E.M., 4 N.E.3d at 644-45 (stating that domestic violence in front of seven children that caused five children to be diagnosed with PTSD could be considered abuse of all the children, including ones not diagnosed with PTSD). Thus, it was critically important for both Mother and Father to bring their drinking under control for the sake of their children.

Despite this, and despite efforts by DCS and others to get Mother and Father to stop drinking through various programs, Mother and Father were not compliant with any services for at least ten months after the CHINS case was initiated. Father continued drinking right until the time of his incarceration in February 2013. Indeed, he told DCS workers not to bother testing him for alcohol consumption prior to his incarceration because he would test positive. It is commendable that Father has taken positive steps to

9

addressing his drinking problem while incarcerated; there is no dispute that he participated in an intensive substance abuse program in prison and has participated in other counseling programs, including anger management. It is worrisome, however, that Father did not begin taking these steps until he was incarcerated despite having opportunities to do so. The trial court expressed its concern that Father's behavior while in prison may not be a reliable indicator of how he will behave when not incarcerated. It also is worth noting that Father's incarceration was not the result of a one-time mistake; his sentence was enhanced for being an habitual substance offender, indicating a long-term problem that he has failed to address in the past despite having opportunities and incentives to do so. In short, despite some evidence of attempts to change conditions as of the time of the termination hearing, the trial court was not required to blindly accept that Father was truly changed, in light of his habitual patterns of conduct and his failure to address his drinking problems in the months prior to his incarceration.

As for Mother, she demonstrated no attempt to curb her drinking until the summer of 2013, over a year after the CHINS case was initiated and only after she twice had her probation revoked for continuing to drink. It is true that there is no evidence that she drank following her second probation revocation. All of her alcohol screenings between August 2013 and the termination hearing in December 2013 were negative. However, Mother also was pregnant during this time frame.

Additionally, even after her second probation revocation, Mother still refused to participate in any IOP alcohol treatment program, despite efforts by DCS and her probation officer. In fact, at the time of the termination hearing, Mother was facing a third revocation

of her probation for failing to complete an IOP treatment program. Just a few days before the hearing, Mother had failed to appear at an IOP appointment. Mother's history of drinking and the negative effect it has had on her life and her repeated failure to address that issue, despite numerous opportunities to do so, permitted the trial court to reject her sobriety beginning in the summer of 2013 as being only a temporary improvement and to conclude that Mother's chances of relapsing were substantial. Furthermore, Mother's lifestyle in the year prior to the termination hearing was highly transient and there was no indication that it would improve any time in the near future. There is sufficient evidence as to both Mother and Father that continuation of the parent-child relationship posed a threat to the children.

Mother and Father also contend there is insufficient evidence that termination is in the children's best interests.[3] The gist of their contention is that, given their recent signs of improvement in battling their alcohol problems, termination of their parental rights should be forestalled and that the children's interest in permanency is outweighed by the possibility that they could be reunited with their parents if Mother and Father continue to improve. The court in E.M. discussed the tension between a child's need for permanency and the fundamental liberty interest at stake in attempting to preserve families. Despite this tension, the court stated that children "have a paramount need for permanency, which we have called 'a central consideration in determining the child's best interests.'" Id. at

---

[3] Mother and Father argue in part that the best interests standard is unconstitutionally vague. They cite no authority for this proposition, however, thus waiving it for appellate review. See Ballaban v. Bloomington Jewish Cmty., Inc., 982 N.E.2d 329, 335 (Ind. Ct. App. 2013).

11

647-48 (quoting K.T.K. v. Indiana Dep't of Child Servs., 989 N.E.2d 1225, 1235 (Ind. 2013)). This need is partially embodied in federal and state laws requiring that reasonable family-preservation efforts be balanced against mandates for accomplishing speedy permanency. Id. at 648. "Simply stated, children cannot wait indefinitely for their parents to work toward preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship.'" Id. (quoting K.T.K., 989 N.E.2d at 1235). The E.M. opinion did caution against the possibility of racial bias, conscious or unconscious, affecting efforts at family reunification.

Here, at the time of the termination hearing, approximately twenty months had passed since the CHINS case was initiated and eighteen months had passed since the children had been removed from the home. For nearly half that time, little to no progress was made by either Mother or Father in addressing their drinking problems. Father's progress only came about as a result of his incarceration, which most favorably would not end until August 2014, or over two years after the children had been removed. Then, K.G. would be required to wait an additional period of time to see if Father could remain sober and obtain suitable housing after being released. As for Mother, she only showed some progress in combatting her drinking problem in the last few months before the termination hearing. She faced a very uncertain future, with the possibility of a third probation revocation looming over her. Any reunification would have to wait until Mother could establish a suitable household for K.C. and possibly K.G., with or without the father of her third child who has a drug-related criminal history. In other words, even assuming Mother

12

and Father had made some progress by the time of the termination hearing, the time frame for any possible reunification with their children was highly uncertain and could last for many months, if not years, if indeed it ever were to take place.

In the meantime, the children were being well-cared for by a foster family that wished to adopt both children. Keeping the children together was crucially important, as they were closely bonded to each other. Also, there is no claim or evidence by Mother and Father that DCS's wish to move forward with termination and adoption by the foster family was tainted by any racial bias. As such, we cannot say the trial court clearly erred in finding that termination was in the children's best interests.

## Conclusion

Even if we were to say that the evidence in this case could have supported denial of DCS's termination petition as to either or both parents, we cannot say the evidence compelled denial. Instead, the trial court's findings are not clearly erroneous and they permitted the termination of Mother and Father's parental rights. We affirm.

Affirmed.

BRADFORD, J., and BROWN, J., concur.